130 F.3d 464
 327 U.S.App.D.C. 235
 ANIMAL LEGAL DEFENSE FUND, INC., et al., Appellees
v.
Daniel R. GLICKMAN, Secretary, United States Department of
Agriculture, et al., Appellants
National Association for Biomedical Research, Intervenor-Appellant
 Nos. 97-5009, 97-5031 and 97-5074.
 United States Court of Appeals,
District of Columbia Circuit.
Argued Sept. 12, 1997.
Decided Dec. 9, 1997.
Rehearing En Banc Granted March 10, 1998.
 
 Animal welfare group and four individuals sued United States Department of Agriculture (USDA) under Administrative Procedure Act (APA), alleging that USDA regulation concerning treatment of primates failed to comply with requirements of governing statute, the Animal Welfare Act (AWA). The United States District Court for the District of Columbia, Charles R. Richey, J., 943 F.Supp. 44, held that regulation was invalid. USDA appealed. The Court of Appeals, Sentelle, Circuit Judge, held that plaintiffs lacked constitutional standing.
 Vacated and remanded with instructions.
 Wald, Circuit Judge, issued dissenting opinion.
 [327 U.S.App.D.C. 237] Appeals from the United States District Court for the District of Columbia (No. 96cv00408).
 John S. Koppel, Attorney, United States Department of Justice, argued the cause for the federal appellants, with whom Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., United States Attorney, Washington, DC, at the time the briefs were filed, and Michael Jay Singer, Attorney, United States Department of Justice, were on the briefs.
 Harris Weinstein, Washington, DC, argued the cause and filed the briefs for intervenor-appellant National Association for Biomedical Research.
 Katherine A. Meyer, Washington, DC, argued the cause for appellees, with whom Valerie J. Stanley, Rockville, MD, was on the briefs.
 Andrew L. Frey, Washington, DC, was on the brief for amicus curiae Pharmaceutical Research and Manufacturers of America.
 Leslie G. Landau, San Francisco, CA, Susan Hoffman, and Tiffany R. Hedgpeth were on the brief for amicus curiae The Jane Goodall Institute for Wildlife Research, Education and Conservation. Barry J. Cutler, Washington, DC, and Joseph R. Austin, Los Angeles, CA, entered appearances.
 Before: WALD, SENTELLE and HENDERSON, Circuit Judges.
 Opinion for the court filed by Circuit Judge SENTELLE.
 Dissenting opinion filed by Circuit Judge WALD.
 SENTELLE, Circuit Judge:
 
 
 1
 An animal welfare group and four individuals sued the United States Department of Agriculture and some of its officials (collectively, "USDA" or "the Department") under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq. (1988). These plaintiffs argued that a USDA regulation concerning the treatment of primates failed to comply with the requirements of the governing statute, the Animal Welfare Act ("AWA" or "the Act"), and asked the district court to set the regulation aside. After concluding that the plaintiffs had standing to sue, the district court entered judgment invalidating the challenged regulation and ordered USDA to promulgate a new regulation in compliance with the Act. See Animal Legal Defense Fund, Inc. v. Glickman, 943 F.Supp. 44 (D.D.C.1996). USDA appealed.
 
 
 2
 After reviewing the record, we conclude that all of the plaintiffs (now appellees) lack constitutional standing to pursue their claims. Accordingly, we vacate the judgment of the district court and remand with instructions to dismiss the case for want of jurisdiction.
 
 I.
 
 3
 This appeal is but the latest chapter in the ongoing saga of Animal Legal Defense Fund, Inc.'s ("ALDF") effort to enlist the courts in its campaign to influence USDA's administration of the Animal Welfare Act, 7 U.S.C. § 2131 et seq. Congress enacted the Act in 1966 to ensure the humane care and treatment of various animals used in research or for exhibition or kept as pets. 7 U.S.C. § 2131. Pursuant to a 1985 amendment, the Act requires the Secretary of USDA ("Secretary") to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors." 7 U.S.C. § 2143(a)(1). Such standards must include "minimum requirements ... for a physical environment adequate to promote the psychological well-being of primates." 7 U.S.C. § 2143(a)(2)(B).
 
 
 4
 In 1991, pursuant to section 2143(a), the Secretary promulgated rules on the handling, care and treatment of primates. See 9 C.F.R. § 3.75 et seq. The rule at issue in this appeal requires regulated entities to "develop, document, and follow an appropriate [327 U.S.App.D.C. 238] plan for environment enhancement adequate to promote the psychological well-being of nonhuman primates." 9 C.F.R. § 3.81. According to that rule, such a plan "must be in accordance with the currently accepted professional standards as cited in appropriate professional journals or reference guides, and as directed by the attending veterinarian," and must address several specified topics, including "[s]ocial grouping" and "[e]nvironmental enrichment." Id.
 
 
 5
 In 1991, ALDF, along with three individuals and two other organizations, filed a lawsuit challenging several USDA regulations promulgated under the AWA, including section 3.81. The plaintiffs' principal argument was that, by permitting the regulated entities to develop their own environmental enhancement plans, the regulations failed to include "minimum requirements" as mandated by the AWA, see 7 U.S.C. § 2143(a)(2), and instead impermissibly delegated promulgation of these requirements to the regulated entities. The district court ruled for the plaintiffs, and set aside the challenged regulations. See Animal Legal Defense Fund v. Secretary of Agriculture, 813 F.Supp. 882 (D.D.C.1993). We reversed, holding that all of the plaintiffs lacked standing to challenge the regulations. Animal Legal Defense Fund, Inc. v. Espy, 29 F.3d 720, 722 (D.C.Cir.1994) ("ALDF II" ).[1]
 
 
 6
 ALDF mounted a second challenge to section 3.81 in 1996. This time, it was joined by a different group of individual co-plaintiffs: Roseann Circelli, Mary Eagan, Marc Jurnove, and Audrey Rahn. Ruling on the plaintiffs' motion for summary judgment, the district court again invalidated section 3.81, and ordered the Secretary to promulgate a new regulation in compliance with the "minimum requirements" mandate of the AWA.
 
 II.
 
 7
 Under Article III of the Constitution, the "judicial power" of the United States is restricted to the resolution of "cases" and "controversies." U.S. CONST. art. III, § 2, cl. 1. In order to limit the docket of federal courts to "disputes ... which are traditionally thought to be capable of resolution through the judicial process" and to restrict federal courts "to a role consistent with a system of separated powers," Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting Flast v. Cohen, 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968)) (internal quotation marks omitted), our Article III jurisprudence has identified a cluster of doctrines, " 'standing[,] mootness, ripeness, political question, and the like,' by which we test the fitness of controversies for judicial resolution." Louisiana Environmental Action Network v. Browner, 87 F.3d 1379, 1382 (D.C.Cir.1996) (quoting Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)) (additional citations and internal punctuation omitted).
 
 
 8
 In furtherance of the limitations of Article III, the standing doctrine requires would-be federal litigants to demonstrate an (1) injury in fact; (2) which is caused by, or is fairly traceable to, the alleged unlawful conduct; and (3) which is likely to be redressed by a favorable decision of the court. Valley Forge, 454 U.S. at 471-72, 102 S.Ct. at 757-59; see also Bennett v. Spear, 520 U.S. 154, ----, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136-37, 119 L.Ed.2d 351 (1992). The party invoking federal jurisdiction bears the burden of establishing these elements, FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231, 110 S.Ct. 596, 607-08, 107 L.Ed.2d 603 (1990), and may not pursue its claims before the federal judiciary if it fails to demonstrate any one of them. Florida Audubon Soc'y v. Bentsen, 94 F.3d 658, 662-63 (D.C.Cir.1996) (in banc). Neither the individual appellees nor the Animal Legal Defense Fund have successfully borne that burden. We consider first the individual appellees Circelli, Jurnove and Eagan.[2] We [327 U.S.App.D.C. 239] assume their factual allegations to be true for purposes of this appeal. See Defenders of Wildlife, 504 U.S. at 561, 112 S.Ct. at 2136-37.
 
 A.
 
 9
 Roseann Circelli, Marc Jurnove and Mary Eagan have viewed primates housed in isolation at local zoos. Circelli saw an orangutan who could neither see nor hear other primates, and who sat quietly by himself in a corner. Circelli Affidavit p 8. Jurnove saw a large male chimpanzee who was kept in isolation from other primates, and whose hands and feet were covered with scars and cuts. Jurnove Affidavit p 8. Eagan has seen primates housed in isolation as well, "including one baby baboon and another primate named Charlie." Eagan Affidavit p 4.
 
 
 10
 These appellees, all of whom enjoy visiting animals in captivity, say they have suffered aesthetic and recreational injuries resulting from their observation of these primates. Under some circumstances, interference with the observation and study of animals may constitute injury in fact for standing purposes.[3] Humane Soc'y of the U.S. v. Babbitt, 46 F.3d 93, 97 (D.C.Cir.1995). It is not apparent, however, that these appellees have met their burden of demonstrating a cognizable injury in fact. "[G]eneral emotional 'harm,' no matter how deeply felt, cannot suffice for injury-in-fact for standing purposes." Id. at 98. It is part of the price of living in society, perhaps especially in a free society, that an individual will observe conduct that he or she dislikes. "[T]he psychological consequence presumably produced by observation of conduct with which one disagrees ... is not an injury sufficient to confer standing under Art. III...." Valley Forge, 454 U.S. at 485, 102 S.Ct. at 765. Even assuming that appellees have suffered sufficient injury, we conclude that they nonetheless lack constitutional standing because their claimed injuries are not "fairly traceable" to the Secretary's alleged failure to promulgate "minimum requirements" as mandated by the AWA, and because such injuries are not likely to be redressed by the relief sought in this case. See Defenders of Wildlife, 504 U.S. at 560-61, 112 S.Ct. at 2136-37; Florida Audubon Soc'y, 94 F.3d at 663-64.
 
 B.
 
 11
 In analyzing the "causation" element of constitutional standing, we ask whether it is "substantially probable" that the challenged acts of the defendant--as opposed to the acts of an independent third party--caused a plaintiff's particularized injury. Florida Audubon Soc'y, 94 F.3d at 663 (citations omitted). Our "redressability" inquiry asks whether the relief sought by a plaintiff is likely to alleviate the plaintiff's injury. Id. at 663-64. Causation, then, focuses on whether a particular party is appropriately before the court; redressability focuses on whether the court is the appropriate forum for the parties' dispute. Id. at 664.
 
 
 12
 When a plaintiff asserts injuries attributed to " 'the government's allegedly unlawful regulation (or lack of regulation) of someone else,' " the causation and redressability elements of standing analysis "require more exacting scrutiny." Freedom Republicans, Inc. v. Federal Election Comm'n, 13 F.3d 412, 416 (D.C.Cir.1994) (Wald, J.) (emphasis in original) (quoting Defenders of Wildlife, 504 U.S. at 562, 112 S.Ct. at 2137). Under these circumstances, standing is not necessarily precluded, but the "indirectness of injury 'may make it substantially more difficult to meet the minimum requirements of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm.' " Id. (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 44-45, 96 S.Ct. 1917, 1927-28, 48 L.Ed.2d [327 U.S.App.D.C. 240] 450 (1976)). A plaintiff who claims to have been injured by the government's regulation of a third party must "adduce facts showing that the unfettered choices made by independent actors have been or will be made in such manner as to produce causation and permit redressability of injury." Id. at 417 (quoting Defenders of Wildlife, 504 U.S. at 562, 112 S.Ct. at 2137) (internal quotation marks and brackets omitted).
 
 
 13
 In this case, the zoos at which the primates were housed acted independently; no laws or regulations compelled them to keep the primates in the conditions witnessed by appellees. Granted, when the government takes action that has a "determinative or coercive effect" on a third party, the government may be said to have "caused" injuries which are directly attributable to the third party. Bennett, 520 U.S. at ----, 117 S.Ct. at 1164. But we are aware of no cases--and appellees have provided us with none--in which the government was said to have caused a constitutional injury by failing to issue regulations that would have forbidden third parties from engaging in conduct that caused a plaintiff's injury. The attenuated connection between appellees' claimed injuries and the government's alleged failure to promulgate "minimum requirements" does not present a sufficient " 'causal nexus between the agency action and the asserted injury' " to establish causation. Humane Soc'y, 46 F.3d at 100 (quoting Freedom Republicans, 13 F.3d at 418).
 
 
 14
 Our dissenting colleague is convinced that Jurnove's affidavit establishes standing because it alleges that the inhumane conditions at the Long Island Game Farm are permitted by USDA regulations. Dissent at 474. We disagree, first of all, that a regulation which permits third parties to engage in offensive behavior, but does not require them to do so, may fairly be said to cause an injury resulting from the behavior of the third parties; such a regulation would not have the "determinative or coercive effect" on the third parties which would render the alleged injuries fairly traceable to governmental action. See Bennett, 520 U.S. at ----, 117 S.Ct. at 1164.
 
 
 15
 Furthermore, we disagree with the dissent's interpretation of Jurnove's affidavit. To be sure, as the dissent emphasizes, the affidavit states that USDA inspectors found the Long Island Game Farm to be in compliance with existing regulations on several occasions. See Dissent at 474-75. However, the gravamen of Jurnove's affidavit is that USDA failed to enforce existing regulations, not that the offensive behavior was permitted by them. Jurnove states this conclusion explicitly: he says that the USDA inspection report finding the Game Farm to be "in compliance with all standards" was "incorrect," Jurnove Affidavit pp 18-19, and adds that "[he] knew [that the appalling conditions in which the animals were housed] violated the minimum requirements of the Animal Welfare Act." Id. p 17. The dissent ignores these allegations, which we are bound to accept as true. See Defenders of Wildlife, 504 U.S. at 561, 112 S.Ct. at 2136-37.
 
 
 16
 We turn now to redressability. Our conclusion that appellees' alleged injuries are not "fairly traceable" to the Secretary's actions leads us to the related conclusion that appellees' injuries are not likely to be redressed by compelling the Secretary to promulgate new regulations. See National Wildlife Fed'n v. Hodel, 839 F.2d 694, 705 (D.C.Cir.1988) ("causation" and "redressability" tend to merge in cases where plaintiffs seek cessation of allegedly illegal conduct). Appellees have not shown that it is "likely" that the relief they want (compelling the Secretary to promulgate new regulations) will alleviate their claimed aesthetic and recreational injuries. See Florida Audubon Soc'y, 94 F.3d at 663-64. In any event, appellees were not entirely clear as to how any such alleviation would be accomplished. For example, our review of their affidavits reveals that all of the appellees claim to suffer persisting, painful memories of animal mistreatment. See Jurnove Affidavit p 43 ("I continue to think about [the animals I have witnessed at the Long Island Game Farm], and experience the assault on my senses from remembering their plight."); Circelli Affidavit p 17 ("I continue to think about the animals I observed at the Scotch Plains Zoo in May, 1995, and I continue to be haunted [327 U.S.App.D.C. 241] by the horrible conditions in which I saw them living."); Eagan Affidavit p 4 ("I ... continue to carry the memories of these inhumanely treated animals with me every day, which depresses me and causes me distress."). Appellees do not claim, much less demonstrate, that their painful memories are likely to be obliterated by compelling the Secretary to promulgate new legal regulations.
 
 
 17
 Appellees' claims of redressability are further undercut, given that the district court, whether directly or through appellants, has no power to compel the exhibitors to continue maintaining primates at all, let alone in a manner aesthetically pleasing to appellees. By way of comparison, in Fulani v. Brady, 935 F.2d 1324 (D.C.Cir.1991), we rejected the claimed standing of a would-be competitor in the presidential debates who challenged the tax-exempt status of the sponsoring organization. We did so noting that if we ordered the Treasury to revoke that status, the sponsoring committee might decline to hold the debates at all, a possibility that would not enable the plaintiff to participate as she sought. Id. at 1329. Similarly, if a court ordered the Department to issue different regulations concerning primates, for all we know, the exhibitors might cease keeping primates.
 
 
 18
 We hold that appellees Jurnove, Circelli and Eagan have failed to carry their burden of alleging facts that would demonstrate that the choices of the animal exhibitors "have been or will be made in such manner as to produce causation and permit redressability of injury." Defenders of Wildlife, 504 U.S. at 562, 112 S.Ct. at 2137. Thus, these appellees lack constitutional standing to raise their claims, and we lack power to resolve them.
 
 III.
 
 19
 Having determined that the individual appellees have no standing to bring the present action, we must consider the standing of the Animal Legal Defense Fund. Organizational plaintiffs may assert standing of two sorts. First, an organization may have standing on its own behalf when its rights and immunities as an entity have suffered recognizable injury, redressable in the action at bar. Second, "under proper conditions," it may "sue on behalf of its members asserting the members' individual rights." Common Cause v. Federal Election Comm'n, 108 F.3d 413, 417 (D.C.Cir.1997) (citing Warth v. Seldin, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211-12, 45 L.Ed.2d 343 (1975)). Either way, an organizational plaintiff still must meet the constitutional standing requirements set forth above.
 
 
 20
 In the present action, ALDF claims standing for injury to its own rights, rather than standing derived from its members. Its claimed injury is an alleged violation of its procedural rights in USDA's adoption of section 3.81 governing the "plans" for psychological enrichment of primates. Under the final version of the rule, the regulated keepers of primates need not file such plans with USDA, where they would be subject to disclosure under the Freedom of Information Act, 5 U.S.C. § 552, but only must maintain such plans on their own premises, making them available to USDA "upon request." ALDF, noting that the "upon request" language appeared for the first time in the final rule, complains that neither it nor any other party had the opportunity to submit comments on the language to USDA before its adoption. ALDF argues that the Secretary's failure to provide public notice of the "upon request" language constitutes a violation of the notice and comment procedures of the Administrative Procedure Act. See 5 U.S.C. § 553. According to ALDF, this violation gave rise to a purely procedural injury: the inability to participate in rulemaking as provided by the APA. Indeed, ALDF specifically disclaims any informational injury resulting from a violation of the Animal Welfare Act; it insists instead that its injury "is caused by the agency's violation of the APA."
 
 
 21
 Both we and the Supreme Court have had recent occasion to analyze the standing requirements applicable to an assertion of procedural injury. We concluded that "a plaintiff may have standing to challenge the failure of an agency to abide by a procedural requirement only if that requirement was 'designed to protect some threatened concrete interest' of the plaintiff." Florida [327 U.S.App.D.C. 242] Audubon Soc'y, 94 F.3d at 664 (quoting Defenders of Wildlife, 504 U.S. at 573 n. 8, 112 S.Ct. at 2143, n. 8). Therefore, "[t]he mere violation of a procedural requirement ... does not permit any and all persons to sue to enforce the requirement." Id. Rather, a party claiming to be injured by a procedural violation must show that the violation is likely to harm the party in a specific and individualized way. Id.; see also Defenders of Wildlife, 504 U.S. at 573 n. 8, 112 S.Ct. at 2143, n. 8 (holding that a plaintiff may enforce procedural rights "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing").
 
 
 22
 Here, ALDF claims that the Secretary has failed to comply with the notice and comment procedures of the APA. This abstract, generalized "injury" is not sufficient to afford standing. ALDF may have been deprived of the opportunity to submit comments on the "upon request" language of section 3.81. But this predicament is shared by many others, indeed by the world at large. ALDF has failed to make the case that it has suffered a concrete injury as distinguished from the abstract procedural right to submit comments to USDA. Its articulated "injury" amounts to no more than a " 'general interest [in the alleged procedural violation] common to all members of the public.' " Florida Audubon Soc'y, 94 F.3d at 664 (quoting Ex Parte Levitt, 302 U.S. 633, 634, 58 S.Ct. 1 (1937)). Thus, it lacks constitutional standing to pursue the asserted violation in federal court.
 
 IV.
 
 23
 We conclude that none of the appellees have standing to challenge section 3.81. Accordingly, we vacate the judgment of the district court, and remand the case with directions to dismiss for want of jurisdiction.
 
 
 24
 There are two additional appeals before us: (1) ALDF's appeal of the district court's order permitting the National Association of Biomedical Research ("NABR") to intervene in the case for purposes of appealing the district court's invalidation of section 3.81; and (2) NABR's appeal from the ruling of the district court that invalidated section 3.81. Given our decision to vacate the judgment of the district court, we order these separate appeals dismissed as moot.
 
 WALD, Circuit Judge, dissenting:
 
 25
 I find that Marc Jurnove's uncontested affidavit is more than sufficient to meet both the constitutional and the prudential requirements of standing in this case. Hence, I will highlight Mr. Jurnove's claims, without passing on those of the other individual plaintiffs or ALDF. In my view, Mr. Jurnove's affidavit amply illustrates how far the majority opinion has strayed from a reasonable interpretation of standing requirements under Supreme Court and our circuit's law.
 
 I. BACKGROUND
 
 26
 The 1985 amendments to the Animal Welfare Act ("AWA") direct the Secretary of Agriculture to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors." Pub.L. No. 99-198, § 1752, 99 Stat. 1354, 1645 (1985) (codified at 7 U.S.C. § 2143(a) (1994)). They further provide that such standards "shall include minimum requirements" for, inter alia, "a physical environment adequate to promote the psychological well-being of primates." Id. Pursuant to this authority, the United States Department of Agriculture ("USDA") issued regulations for primate dealers, exhibitors, and research facilities that included a small number of mandatory requirements and also required the regulated parties to "develop, document, and follow an appropriate plan for environment enhancement adequate to promote the psychological well-being of nonhuman primates. This plan must be in accordance with the currently accepted professional standards as cited in appropriate professional journals or reference guides, and as directed by the attending veterinarian." 9 C.F.R. § 3.81 (1997). Although these plans must be made available to the USDA, the regulated parties are not obligated to make them available to members of the public. See id.; infra at 474-75.
 
 
 27
 For his entire adult life, Mr. Jurnove has "been employed and/or worked as a volunteer [327 U.S.App.D.C. 243] for various human and animal relief and rescue organizations." Jurnove Affidavit p 3. "By virtue of [his] training in wildlife rehabilitation and [his] experience in investigating complaints about the treatment of wildlife, [he is] very familiar with the needs of and proper treatment of wildlife." Id. p 6. "Because of [his] familiarity with and love of exotic animals, as well as for recreational and educational purposes and because [he] appreciate[s] these animals' beauty, [he] enjoy[s] seeing them in various zoos and other parks near [his] home." Id. p 7.
 
 
 28
 Between May 1995 and June 1996, when he filed his affidavit, Mr. Jurnove visited the Long Island Game Farm Park and Zoo ("Game Farm") at least nine times. Throughout this period, and since as far back as 1992, USDA has not questioned the adequacy of this facility's plan for the psychological well-being of primates.
 
 
 29
 Mr. Jurnove's first visit to the Game Farm, in May 1995, lasted approximately six hours. While there, Mr. Jurnove saw many animals living under conditions that caused him deep distress. For instance, the Game Farm housed one primate, a Japanese Snow Macaque, in a cage lacking both a solid floor and any kind of heating device. Mr. Jurnove reports that he saw this monkey "shivering," "huddled up with her head tucked in and arms hugging herself." Id. p 14. The Game Farm also placed adult bears next to squirrel monkeys, although Jurnove immediately saw evidence that the arrangement made the monkeys frightened and extremely agitated.
 
 
 30
 The day after this visit, Mr. Jurnove began to contact government agencies, including USDA, in order to secure help for these animals. Based on Mr. Jurnove's complaint, USDA inspected the Game Farm on May 3, 1995. According to Mr. Jurnove's uncontested affidavit, however, the agency's resulting inspection report "states that [the USDA inspectors] found the facility in compliance with all the standards." Id. p 18. Mr. Jurnove returned to the Game Farm on eight more occasions because these purportedly legal conditions left him gravely concerned.
 
 
 31
 On July 17, 18, and 19, 1995, he observed "virtually the same conditions" that allegedly caused him aesthetic injury during his first visit to the Game Farm in May. Id. p 20. This time, Mr. Jurnove documented these conditions with photographs and sent them to USDA. Nevertheless, the responding USDA inspectors found only a few violations at the Game Farm; they reported nothing about many of the conditions that concerned Mr. Jurnove and that he had told the agency about.
 
 
 32
 Mr. Jurnove, however, remained unflagging in his determination to rectify conditions at the Game Farm that USDA had now twice concluded were legal. He devoted two trips in August and one in September to "videotaping the conditions that the inspection missed," and on each trip he found that the troubling conditions persisted. Id. pp 22-28. The Japanese snow monkey, for instance, still had no comfortable place to sit; her only cushion against the wire mesh of her cage was a small rag that one visitor had apparently thrown to her. At the end of September, USDA sent three inspectors to the Game Farm in response to Mr. Jurnove's continued complaints and reportage; they found violations, however, only with regard to the facility's fencing.
 
 
 33
 Mr. Jurnove returned to the Game Farm once more on October 1, 1995. Indeed, he only stopped his frequent visits and thorough surveys when he became ill and required major surgery. After his health returned, Mr. Jurnove visited the Game Farm in April 1996, hoping to see improvements in the conditions that he had repeatedly brought to USDA's attention. He was disappointed again; "the animals [were] in literally the same conditions as [he] had seen them over the summer of 1995." Id. p 33; see also id. p 35 ("The Japanese Snow Monkey had no access to a feeding station. No play toys were in her cage. She just sat huddled and shivering violently with head tucked in. She was doing the same thing she had done last April to deal with the cold and the fact she was not provided a heat lamp."). Mr. Jurnove's resulting complaints prompted USDA to inspect the Game Park in late May 1996. For the fourth time, the agency found the facility largely in compliance, with a few exceptions. In June 1996, Mr. Jurnove filed the affidavit that is the basis of his claim [327 U.S.App.D.C. 244] here. He concluded this affidavit by stating his intent to "return to the Farm in the next several weeks" and to "continue visiting the Farm to see the animals there." Id. p 43.
 
 II. ANALYSIS
 
 34
 To my mind, Mr. Jurnove has more than met the requirements for standing. First, his allegations solidly establish injury in fact. As the majority acknowledges, see Majority opinion ("Maj. op.") at 468, the Supreme Court has repeatedly made clear that injury to an aesthetic interest in the observation of animals is sufficient to satisfy the demands of Article III standing. In Japan Whaling Association v. American Cetacean Society, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), for instance, the Court found that the plaintiffs had "undoubtedly ... alleged a sufficient 'injury in fact' in that the whale watching and studying of their members will be adversely affected by continued whale harvesting," id. at 230 n. 4, 106 S.Ct. at 2866, n. 4 (citing Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)); see also Sierra Club, 405 U.S. at 734, 92 S.Ct. at 1366 ("Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process."). Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), reiterated that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing," id. at 562-63, 112 S.Ct. at 2137-38 (emphasis added). This statement precisely describes Mr. Jurnove's claim. Contrary to the majority's suggestion, see Maj. op. at 468, Mr. Jurnove has not only alleged "general emotional 'harm' " stemming from the observation of conduct with which he disagrees, Humane Soc'y v. Babbitt, 46 F.3d 93, 98 (D.C.Cir.1995). Rather, Mr. Jurnove's affidavit describes in great detail how conditions at the Game Farm directly impair his well-established and lifelong aesthetic interest in observing, studying, and enjoying animals by preventing him from seeing these animals in a humane environment.
 
 
 35
 This court's precedent specifically recognizes that people have a significant interest in observing animals living under humane conditions. In Animal Welfare Institute v. Kreps, 561 F.2d 1002 (D.C.Cir.1977), the plaintiff organizations alleged, inter alia, an interest in "enjoy[ing] Cape fur seals alive in their natural habitat under conditions in which the animals are not subject to ... inhumane treatment," id. at 1007. This court held that these plaintiffs' aesthetic interests satisfied the requirements of standing. See id. Similarly, Humane Society v. Hodel, 840 F.2d 45 (D.C.Cir.1988), found standing based on a complaint "that the existence of hunting on wildlife refuges forces Society members to witness animal corpses and environmental degradation, in addition to depleting the supply of animals and birds that refuge visitors seek to view," id. at 52; see also Animal Legal Defense Fund, Inc. v. Espy (ALDF I), 23 F.3d 496, 505 (D.C.Cir.1994) (Williams, J., concurring in part and dissenting in part) ("Our own cases have indicated a recognition of people's interest in seeing animals free from inhumane treatment.").[1]
 
 
 36
 The majority also finds that Mr. Jurnove has not satisfied the causation and redressibility prongs of Article III standing. It contends, first, that Mr. Jurnove has failed to establish causation because he has not adequately established that the Game Farm's treatment of its animals is causally linked to [327 U.S.App.D.C. 245] the actions (or inactions) of the USDA. This argument is false. As the Supreme Court necessarily recognized in Japan Whaling Association, plaintiffs claiming aesthetic injury (there, injury to plaintiffs' interest in whale watching) can establish standing based on the government's failure to adequately regulate a third party (there, the government's failure to certify that the Japanese whaling industry was exceeding its quota under international law). See 478 U.S. at 230 n. 4, 106 S.Ct. at 2866, n. 4. What is required in a case where "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else" is that the plaintiff "adduce facts showing that those choices [by the third party] have been or will be made in such manner as to produce causation and permit redressibility of injury." Lujan, 504 U.S. at 562, 112 S.Ct. at 2137. I believe that Mr. Jurnove has met this test.
 
 
 37
 As Mr. Jurnove's affidavit makes clear, the Game Farm has repeatedly submitted to inspection by the USDA. The allegedly inhumane conditions at the Game Farm have persisted precisely because the USDA inspectors have always concluded on the basis of these visits that these conditions comply with USDA regulations; it is entirely reasonable to presume that if the USDA had found the Game Farm out of compliance with current regulations, or if the governing regulations had themselves been more stringent, the Game Farm's owners would have acted to remain in accord with the law, either by altering their practices or by going out of business and transferring their animals to exhibitors willing to operate legally (two scenarios that would do more to protect Mr. Jurnove's aesthetic interest in observing animals living under humane conditions than the current situation). See id. at 585, 112 S.Ct. at 2149 (Stevens, J., concurring) ("We must presume that if this Court holds that § 7(a)(2) requires consultation, all affected agencies would abide by that interpretation and engage in the requisite consultations."). Instead, however, USDA has not questioned the legality of the Game Farm's plan since 1992. Since May 1995, when Mr. Jurnove began visiting the Game Farm and complaining to the agency, USDA inspectors have examined, and largely approved, the actual conditions at the facility at least four times. USDA's first inspection report "states that [the USDA inspectors] found the facility in compliance with all the standards." Jurnove Affidavit p 18. Although subsequent inspection reports identify a few conditions that Mr. Jurnove agrees violate USDA regulations, USDA continued--in at least three more inspection reports--to conclude that the Game Farm was in compliance with existing USDA regulations in all other respects, including presumably the existence of a plan that met the regulations' standards. As the majority notes, see Maj. op. at 475, Mr. Jurnove alleges in his affidavit that USDA has failed to enforce even its own existing regulations. However, Mr. Jurnove's affidavit is not limited to this allegation. Instead, he additionally alleges that the conditions at the Game Farm, conditions that USDA inspectors repeatedly concluded comply with existing USDA regulations, violate "the minimum requirements" of the governing statute--the Animal Welfare Act. Jurnove Affidavit p 17.
 
 
 38
 Asking Mr. Jurnove to show more than this as a constitutional prerequisite to standing places him in a Catch-22. One reason ALDF is dissatisfied with USDA's implementation of the 1985 amendments to the Animal Welfare Act is that USDA's present regulations do not require regulated entities to give a copy of their plans to the agency, where they would be subject to Freedom of Information Act requests. See 9 C.F.R. § 3.81 (1997); Kissinger v. Reporters Committee for Freedom of the Press, 445 U.S. 136, 151-52, 100 S.Ct. 960, 969, 63 L.Ed.2d 267 (1980) (finding that "FOIA is only directed at requiring agencies to disclose those 'agency records' for which they have chosen to retain possession or control"). This oversight structure means that Mr. Jurnove has no access to the Game Farm's plan, no way to determine whether the facility is following it, and no means to discover whether the plan itself conforms to current USDA regulations. See Oral Argument (statement of government counsel) (confirming that the Game Farm's owners are not obligated to show [327 U.S.App.D.C. 246] their plans to the plaintiffs)[2]; Oral Argument (statement of ALDF counsel) (reporting that plaintiffs have not been able to see any exhibitor plans).[3] Under the regulatory regime that USDA created, and that Mr. Jurnove challenges, all he can do is rely on USDA's repeated determinations that the Game Farm is operating legally. In my view, that is all a reasonable interpretation of causation can demand of him.
 
 
 39
 The majority's discussion of redressibility, in turn, mischaracterizes Mr. Jurnove's claims. Mr. Jurnove's alleged injuries are not limited to "persisting, painful memories of animal mistreatment." Maj. op. at 469. Rather, Mr. Jurnove also alleges that he has a current routine of regularly visiting the Game Farm and provides a limited time period within which he will make his next visit, stating that he plans to "return to the Farm in the next several weeks" and to "continue visiting the Farm to see the animals there." Jurnove Affidavit p 43. More stringent regulations, that prohibit the inhumane conditions that have consistently caused Mr. Jurnove aesthetic injury in the past, will necessarily improve his aesthetic experience during his planned, future trips to the Game Farm. If one makes the assumption, which I think one should, that the Game Farm's owners will abide by the law, then tougher regulations will either allow Mr. Jurnove to visit a more humane Game Farm or (if the Game Farm's owners decide to close rather than comply with higher legal standards), to visit the animals he has come to know in their new homes within exhibitions that comply with the more exacting regulations.
 
 
 40
 In addition to satisfying the three constitutional requirements for standing, Mr. Jurnove also falls within the zone of interests protected under the AWA's provisions on animal exhibitions:
 
 
 41
 "[I]n cases where the plaintiff is not itself the subject of the contested regulatory action, the [zone of interests] test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff."
 
 
 42
 Akins v. Federal Election Comm'n, 101 F.3d 731, 739 (D.C.Cir.1996) (en banc) (quoting Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 399-400, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987)), cert. granted, --- U.S. ----, 117 S.Ct. 2451, 138 L.Ed.2d 210 (1997); see also ALDF I, 23 F.3d at 502 ("The [zone of interests] test precludes review of administrative action if the particular interest asserted is 'so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.' " (quoting Clarke, 479 U.S. at 399, 107 S.Ct. at 750)); Autolog Corp. v. Regan, 731 F.2d 25, 29-30 (D.C.Cir.1984) ("[T]he zone of interests test requires some indicia--however slight--that the litigant before the court was intended to be protected, benefitted or regulated by the statute under which suit is brought. Courts should give broad compass to a statute's zone of interests in recognition that this test was originally intended to expand the number of litigants able to assert their rights in court.") (citations and internal quotation marks omitted). [327 U.S.App.D.C. 247] In this case, logic, legislative history, and the structure of the AWA all indicate that Mr. Jurnove's injury satisfies the zone of interests test. The very purpose of animal exhibitions is, necessarily, to entertain and educate people; exhibitions make no sense unless one takes the interests of their human visitors into account. The legislative history of the 1985 amendments to the Animal Welfare Act confirms that Congress acted with the public's interests in mind. In introducing these amendments, Senator Robert Dole explained "that we need to ensure the public that adequate safeguards are in place to prevent unnecessary abuses to animals, and that everything possible is being done to decrease the pain of animals during experimentation and testing." 131 CONG. REC. 29,155 (1985) (statement of Sen. Dole). Moreover, while the AWA establishes oversight committees with private citizen members for research facilities, see 7 U.S.C. § 2143(b)(1) (1994), it creates no counterpart for animal exhibitions, leaving the representation of the public interest wholly to individuals like Mr. Jurnove. Mr. Jurnove, a regular viewer of animal exhibitions regulated under the AWA, clearly falls within the zone of interests the statute protects.
 
 III. CONCLUSION
 
 43
 Twenty-five years ago, Justice Douglas argued in dissent that "[t]he critical question of 'standing' [in environmental cases] would be simplified and also put neatly in focus if we fashioned a federal rule that allowed environmental issues to be litigated before federal agencies or federal courts in the name of the inanimate object about to be despoiled, defaced, or invaded by roads and bulldozers." Sierra Club, 405 U.S. at 741, 92 S.Ct. at 1369 (Douglas, J., dissenting). This case hardly requires us to recognize the independent standing of animals; Mr. Jurnove's allegations fall well within the requirements of our existing precedent. But it is striking, particularly in a world in which animals cannot sue on their own behalf, how far the majority opinion goes toward making governmental action that regulates the lives of animals, and determines the experience of people who view them in exhibitions, unchallengeable. See Oral Argument (statement of government counsel) (voicing his inability to identify one party who would have standing to challenge the USDA regulations implementing the AWA provisions on animal exhibitions).[4] Because such a result offends the compassionate purposes of the statute, and our precedents do not require it, I respectfully dissent.
 
 
 
 [1]
 We shall refer to this case as ALDF II to distinguish it from an earlier case with the same name, which involved a challenge to a different USDA regulation. See Animal Legal Defense Fund, Inc. v. Espy, 23 F.3d 496 (D.C.Cir.1994) ("ALDF I")
 
 
 [2]
 The district court did not rule that plaintiff Audrey Rahn had standing to challenge section 3.81. See Animal Legal Defense Fund, Inc., 943 F.Supp. at 54-57. Thus, we shall not address her claims here
 
 
 [3]
 As our dissenting colleague acknowledges, see Dissent at 473 n.1, all of the Supreme Court cases recognizing such an injury have done so when the challenged conduct threatens to diminish the overall supply of an animal species available for observation or study. Since this case does not involve allegations of such conduct, none of the cases cited by the dissent compels the conclusion that the individual appellees have articulated a cognizable constitutional injury
 
 
 [1]
 I do not think it dispositive that the Supreme Court cases that have thus far recognized standing based on an aesthetic interest in the observation or study of animals have all involved challenged conduct that allegedly threatened to diminish the overall supply of an animal species available for observation or study. See Lujan, 504 U.S. at 562, 112 S.Ct. at 2137; Japan Whaling Ass'n, 478 U.S. at 230 n. 4, 106 S.Ct. at 2866, n. 4; see also Maj. op. at 468 n.3. I cannot believe that constitutional standing actually turns on the difference between an observer's aesthetic injury from government action that threatens to wipe out an animal species altogether and government action that leaves some of the animals in a persistent state of suffering, which in all probability eventually will insure their demise. Indeed, the latter seems capable of causing more serious aesthetic injury in many instances
 
 
 [2]
 The oral argument proceeded as follows:
 Q. Correct me if I'm not mistaken: It's pretty hard for the plaintiffs or Mr. Jurnove to know what's in the plan because it isn't accessible to them. Is that correct?
 A. Yes, your honor.
 Q. I mean, can they go to the Long Island Zoo, the farm, and say I want to see your plan?
 A. Well, they can try. I don't think the exhibitors have any obligation.
 Q. But the exhibitor doesn't have to make it available to him under the regulations.
 
 
 [3]
 The oral argument proceeded as follows:
 Q. Have you ever, did.... At any point in this lawsuit, you didn't ever see any of these plans, did you?
 A. No, your honor. We're not allowed to see them. That's the other thing. These are secret plans. This is secret law to the nth degree, your honor. These are, these plans are taking the place of the minimum requirements that Congress directed the Secretary to promulgate, yet the public doesn't even get to see what those minimum requirements are because their plans are, by deliberate action of the agency, are kept at the facility and thereby kept from public disclosure.
 
 
 [4]
 The oral argument proceeded as follows:
 Q. Can you conceive of a situation where, can you envision, or could you enlighten us on whether you think there could ever be a situation under this Act where any kind of a plaintiff could make a necessary showing?
 A. Your honor, we wouldn't absolutely rule it out. But, we do believe....
 Q. No, no. But I can't even, I can't conceptualize it myself. I thought you might help me, if your arguments here are valid ones.
 A. Again, we are really only dealing with the parties, and the facts, and the circumstances of this case.
 Q. Well, I know.
 A. We can't rule out the possibility there would be a plaintiff.
 Q. But you can't, you can't....
 Q. (second judge) If the answer is no, you might want to say no.
 Q. (back to original questioner) Yeah, yeah, yeah. But you can't think of it; I can't think of it. I don't know that that destroys your argument, I just thought there might be some extra element that you could identify that was, you know, missing here. Somebody says I go to the zoo, the highlight of my week, I go to the zoo every Saturday afternoon at two o'clock. And I know they have a plan on file, and I know that the USDA said the plan is adequate. But when I go there, there are these animals crying, and all alone, and lying in their feces, and all the other kinds of things there. That's not adequate? I'm just trying to figure out can anything ever be adequate? I guess the answer is no. I mean the answer that I can think of....
 A. Probably not. Probably not, your honor.
 Q. So what you're saying is Congress just never meant there to be anything except the official enforcement mechanism?
 A. Yes, your honor.