United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 29, 1999 Decided February 1, 2000 

 No. 97-5009

 Animal Legal Defense Fund, Inc., et al., 
 Appellees

 v.

 National Association for Biomedical Research, 
 Appellant

 Consolidated with 
 Nos. 97-5031 and 97-5074

 Appeals from the United States District Court 
 for the District of Columbia 
 (No. 96cv00408)

 John S. Koppel, Attorney, U.S. Department of Justice, 
argued the cause for appellants in Nos. 97-5009 and 97-5031. 
With him on the briefs were David W. Ogden, Acting Assis-

tant Attorney General, Michael Jay Singer, Attorney, and 
Wilma A. Lewis, U.S. Attorney.

 Harris Weinstein and Michael G. Michaelson were on the 
briefs for appellant National Association for Biomedical Re-
search in No. 97-5009.

 Sheldon E. Steinbach, Robert H. Loeffler and Stephen S. 
Dunham were on the brief for amici curiae The Association of 
American Medical Colleges, The American Council on Edu-
cation and The Pharmaceutical Research and Manufacturers 
Association of America.

 Katherine A. Meyer and Valerie J. Stanley filed the briefs 
for appellants in No. 97-5074.

 Katherine A. Meyer argued the cause for appellees in No. 
97-5009. With her on the brief was Valerie J. Stanley.

 Harris Weinstein and Michael G. Michaelson were on the 
brief for the National Association for Biomedical Research as 
appellee in No. 97-5074.

 Leslie G. Landau was on the brief for amicus curiae The 
Jane Goodall Institute for Wildlife Research, Education and 
Conservation.

 Before: Williams, Sentelle, Garland, Circuit Judges.

 Opinion for the court filed by Circuit Judge Williams.

 Williams, Circuit Judge: In Animal Legal Defense Fund, 
Inc. v. Glickman, 154 F.3d 426 (D.C. Cir. 1998) (en banc), we 
held that plaintiff Marc Jurnove has standing to challenge 
regulations promulgated by the Secretary of Agriculture in 
1991 that purport to set "minimum requirements ... for a 
physical environment adequate to promote the psychological 
well-being of primates." 7 U.S.C. s 2143(a)(1)-(2). The en 
banc court left untouched the panel's decision that Animal 
Legal Defense Fund lacked standing. 154 F.3d at 428-29 n.3. 
The court referred the merits--the question whether the 
Secretary's regulations satisfy that statutory mandate and the 
Administrative Procedure Act--to a future panel. Id. at 429, 
445. Finding that the regulations do meet the statutory and 

APA tests, we reverse the district court's decision to the 
contrary.

 * * *

 In 1985 Congress passed the Improved Standards for 
Laboratory Animals Act, Pub. L. No. 99-198, 99 Stat. 1645, 
amending the Animal Welfare Act of 1966. See 7 U.S.C. 
s 2131 et seq. The 1985 amendments directed the Secretary 
of Agriculture to promulgate "standards to govern the hu-
mane handling, care, treatment, and transportation of animals 
by dealers, research facilities, and exhibitors." Id. 
s 2143(a)(1). The Act specified that among these must be 
"minimum requirements ... for a physical environment ade-
quate to promote the psychological well-being of primates." 
Id. s 2143(a)(1)-(2).

 There are over 240 species of non-human primates, ranging 
from marmosets of South America that are a foot tall and 
weigh less than half a pound to gorillas of western Africa 
standing six feet tall and weighing up to 500 pounds. It 
proved no simple task to design regulations to promote the 
psychological well-being of such varied species as they are 
kept and handled for exhibition and research. Notice of 
intent to issue regulations was first published in the Federal 
Register in 1986, 51 Fed. Reg. 7950 (1986), but the Secretary 
did not publish proposed regulations until 1989. 54 Fed. Reg. 
10897 (1989). After receiving a flood of comments (10,686 
timely ones, to be precise), the Secretary reconsidered the 
regulations and published new proposed regulations in 1990. 
55 Fed. Reg. 33448 (1990). After receiving another 11,392 
comments, he adopted final regulations in 1991. 56 Fed. Reg. 
6426 (1991); 9 CFR s 3.81.

 The final regulations consist of two separate modes of 
regulation, typically known as engineering standards and 
performance standards. The former dictate the required 
means to achieve a result; the latter state the desired out-
comes, leaving to the facility the choice of means. See 56 
Fed. Reg. at 6427 (discussing engineering and performance 
standards generally). The Secretary identifies five guidelines 

that he considers engineering standards, which in substance 
require as follows: (1) restraints are generally prohibited 
subject to certain exceptions as determined by the attending 
veterinarian or the research proposal, 9 CFR s 3.81(d); (2) 
primary enclosures must be "enriched" so that primates may 
exhibit their typical behavior, such as swinging or foraging, 
id. s 3.81(b); (3) certain types of primates must be given 
special attention, including infants, young juveniles, individu-
ally housed primates, and great apes over 110 pounds, again 
in accord with "the instructions of the attending veterinari-
an," id. s 3.81(c); (4) facilities must "address the social needs 
of nonhuman primates ... in accordance with currently ac-
cepted professional standards ... and as directed by the 
attending veterinarian," but they may individually house pri-
mates under conditions further specified in the regulations, 
id. s 3.81(a); and (5) minimum cage sizes are set according to 
the typical weight of different species, id. s 3.80(b)(2)(i).

 To implement these guidelines and to promote the psycho-
logical well-being of the primates, facilities must develop 
performance plans:

 Dealers, exhibitors, and research facilities must develop, 
 document, and follow an appropriate plan for environ-
 ment enhancement adequate to promote the psychologi-
 cal well-being of nonhuman primates. The plan must be 
 in accordance with the currently accepted professional 
 standards as cited in appropriate professional journals or 
 reference guides, and as directed by the attending veteri-
 narian. This plan must be made available to APHIS 
 [Animal and Plant Health Inspection Service] upon re-
 quest, and, in the case of research facilities, to officials of 
 any pertinent funding agency.
 
Id. s 3.81.

 Jurnove primarily maintains that nothing about these regu-
lations establishes "minimum requirements ... for a physical 
environment adequate to promote the psychological well-
being of primates," and that the Secretary's use of perfor-
mance plans and his apparent deference to on-site veterinari-

ans amount to an impermissible delegation of his legal re-
sponsibility.

 The district court agreed. Animal Legal Defense Fund v. 
Glickman ("ALDF"), 943 F. Supp. 44 (D.D.C. 1996). It held 
that the regulation "fails to set standards," by which the 
district court meant engineering standards, and that "the 
regulation completely delegates the establishment of such 
standards to the regulated entities" because "[a]t best, the 
regulation refers these entities to the direction of their at-
tending veterinarians--who are not under the control of the 
agency." Id. at 59. The district court also concluded that 
the Secretary had a duty to require social housing of primates 
given a finding by the Secretary that "[i]n general, housing in 
groups promotes psychological well-being more assuredly 
than does individual housing." Id. at 60 (quoting 56 Fed. 
Reg. at 6473). As the court read the regulation "the agency 
delineates only when social grouping might not be provided," 
and therefore "the regulation does not contain any minimum 
requirement on a point recognized by the agency itself as 
critical to the psychological well-being of primates." Id.

 * * *

 Jurnove argues that the plain language of the statute--the 
Secretary shall establish "minimum requirements ... for a 
physical environment adequate to promote the psychological 
well-being of primates"--requires that the Secretary spell out 
exactly how primates may and may not be housed and 
handled (i.e., engineering standards), or at least spell out the 
"minimum requirements" in this manner. The Secretary's 
emphatic first response is: we did.

 Jurnove consistently reads the regulations, as did the dis-
trict court, as if the only "requirement" of the facilities is the 
production of a performance plan and that, basically, anything 
goes--provided the facilities honor what he views as the 
empty formality of finding some sort of support from "cur-
rently accepted professional standards as cited in appropriate 
professional journals or reference guides" and from "the 
attending veterinarian." 9 CFR s 3.81. This reading yields 

an obvious parade of horribles. Facilities will find unscrupu-
lous veterinarians to rubber-stamp outrageous practices, and 
fringe periodicals will be the coin of the animal realm. This, 
argues Jurnove, is not the setting of "standards" or "mini-
mum requirements" that the statute plainly commands.

 We need not decide when performance standards alone 
could satisfy a congressional mandate for minimum require-
ments, or whether the sort of agency deference depicted by 
Jurnove could ever do so. The regulations here include 
specific engineering standards. The most obvious example is 
the regulation of cage sizes, id. s 3.80, which even Jurnove 
grants is an engineering standard. Jurnove attempts to 
discount the "primary enclosure" requirements because they 
appear in a different section of the regulations, and the 
Animal Welfare Act had previously mandated standards for 
"housing." But the Secretary stated that the cage require-
ments were set as part of the standards for promoting 
psychological well-being, 56 Fed. Reg. at 6468, and it is 
perfectly permissible to implement congressional commands 
through complementary regulations, some of which serve 
multiple goals. See Public Citizen, Inc. v. FAA, 988 F.2d 
186, 192-93 (D.C. Cir. 1993).

 The Secretary's requirement bases cage size on the weight 
of the primate, with special provisions for great apes, whereas 
the previous regulations merely required "sufficient space to 
allow each nonhuman primate to make normal postural ad-
justments with adequate freedom of movement." 56 Fed. 
Reg. at 6469. By hiking the requirements, the Secretary 
addressed an issue that Congress considered one of the 
central elements of a primate's psychological well-being. The 
statutory language speaks of minimum requirements for the 
"physical environment" of the primate, 7 U.S.C. 
s 2143(a)(2)(B), and the Conference Committee noted that 
"[t]he intent of standards with regard to promoting the 
psychological well-being of primates is to provide adequate 
space equipped with devices for exercise consistent with the 
primate's natural instincts and habits." H.R. Conf. Rep. No. 
99-447, at 594 (1985) (emphasis added).

 Similarly, the regulations on environmental enrichment, 
special consideration of certain primates (infants, juveniles, 
etc.), and restraint devices all plainly provide engineering 
standards. 9 CFR s 3.81(b)-(d). The facilities "must" pro-
vide environmental enrichment and special consideration for 
certain primates, id. s 3.81(b), (c), and they "must not" 
maintain primates in restraint devices "unless required for 
health reasons as determined by the attending veterinarian or 
by a research proposal approved by the Committee at re-
search facilities," id. s 3.81(d). The regulation on restraints 
then makes clear that even where a veterinarian approves of 
restraints, there are still limits:

 Maintenance under such restraint must be for the short-
 est period possible. In instances where long-term (more 
 than 12 hours) restraint is required, the nonhuman pri-
 mate must be provided the opportunity daily for unre-
 strained activity for at least one continuous hour during 
 the period of restraint, unless continuous restraint is 
 required by the research proposal approved by the Com-
 mittee at research facilities.
 
Id. Although research facilities may be allowed to restrain 
primates continuously, this limited exception is not offered to 
non-research handlers and is in keeping with the statute's bar 
on the Secretary from interfering with research. See 7 
U.S.C. s 2143(a)(6)(A)(i)-(iii).

 These "requirements" may be minimal but they are clearly 
mandatory. Jurnove argued, and the district court agreed, 
that this case begins and ends with the fact that the Secre-
tary provided no engineering standards. ALDF, 943 
F. Supp. at 59. But in fact he did.1

__________
 1 Having found that the Secretary "ha[s] not yet issued stan-
dards," the district court went on to hold that he had "unlawfully 
withheld and unreasonably delayed" action in violation of the APA; 
it ordered the Secretary to "commence appropriate rulemaking 
procedures" and promulgate standards. 943 F. Supp. at 59-60. 
Our holding here moots this theory and accordingly we vacate that 
portion of the order.

 It of course remains possible that the engineering and 
performance standards chosen by the Secretary are not 
enough to meet the mandate of "minimum requirements." 
We assess this issue under the familiar doctrine that if 
Congress has spoken to the precise question at issue, we 
must "give effect to the unambiguously expressed intent of 
Congress," but if Congress has not, we defer to a permissible 
agency construction of the statute. Chevron U.S.A. Inc. v. 
NRDC, 467 U.S. 837, 842-43 (1984).

 Here Jurnove's Exhibit A (and indeed his only serious 
example) is the Secretary's handling of primates' "social 
grouping." In 1989 the Secretary proposed to include a 
requirement of group housing for primates, saying that he 
intended to emphasize that

 nonhuman primates must be grouped in a primary enclo-
 sure with compatible members of their species or with 
 other nonhuman primate species, either in pairs, family 
 groups, or other compatible social groupings, whenever 
 possible and consistent with providing for the nonhuman 
 primates' health, safety, and well-being, unless social 
 grouping is prohibited by an animal care and use proce-
 dure and approved by the facility's Committee.
 
54 Fed. Reg. 10822, 10917 (1989). This proposal was based 
on evidence that "nonhuman primates are social beings in 
nature and require contact with other nonhuman primates for 
their psychological well-being," and that "[s]ocial deprivation 
is regarded by the scientific community as psychologically 
debilitating to social animals." Id.

 The final rule, of course, refrained from imposing such a 
general group housing requirement. Jurnove (stating his 
case in the best light) would tie the agency to its 1989 
proposal on two theories: He argues first under Chevron that 
because of this finding any interpretation of the statute not 
recognizing social grouping as one of the "minimum require-
ments" could not be a reasonable interpretation of the stat-
ute. And second he claims that the Secretary's decision was 
arbitrary and capricious because he failed to explain it ade-
quately, in violation of the Administrative Procedure Act and 

the principles set out in Motor Vehicle Mfrs. Ass'n v. State 
Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983). We 
have distinguished between Chevron review and State Farm 
arbitrary and capricious review, see Arent v. Shalala, 70 F.3d 
610, 615-16 (D.C. Cir. 1995), but the two issues "overlap at 
the margins," id. at 615, 616 n.6; Independent Petroleum 
Assn. v. Babbitt, 92 F.3d 1248, 1258 (D.C. Cir. 1996), and our 
review here exemplifies such overlap. See also Kenneth Culp 
Davis & Richard J. Pierce, Jr., Administrative Law Treatise, 
s 7.4, p. 214-15 (Supp. 1998) ("[T]here is complete overlap 
between Chevron step two and State Farm ... a rule that 
adopts an 'unreasonable' interpretation of a statute within the 
meaning of Chevron step two is 'arbitrary and capricious' 
within the meaning of State Farm.").

 The Secretary's 1989 proposal was at odds with comments 
already in the record. For example, comments of the Ameri-
can Psychological Association had noted the wide disparities 
in social behavior among primates, with some forming large 
troops of 50 to 100 or more, others living in small groups of 
10 to 20, and still others spending their lives in almost 
solitary isolation or as pairs in the wild. The 1989 proposal 
itself then generated new opposing comments, most notably 
from the University of Chicago, which pointed out that group 
housing "can significantly increase the incidence of trauma, 
the spread of upper respiratory and gastrointestinal diseases 
and more recently has been responsible for the outbreak of 
Simian Acquired Immune Deficiency Syndrome." Moreover, 
according to these comments, an image of nonhuman pri-
mates blissfully coexisting in groups is a substantially incom-
plete depiction of species-typical behavior. Again, as the 
University of Chicago informed the Secretary: "Even in 
compatible groups in no specific distress, species typical 
activities include threatening, chasing, fighting, wounding, 
hair-pulling, food competition, dominance challenges and re-
versals, and displacement of subordinate animals from food, 
water and shelter. Such activity can threaten the animals' 
health and well-being."

 The Secretary took account of such comments, just as the 
designers of "notice and comment" rulemaking intended. He 

pointed to expressions of concern that "social grouping would 
endanger the animal's [sic] welfare by increasing noise and 
fighting," 55 Fed. Reg. at 33491, and to contentions that 
differences among species (there are, recall, over 240) re-
quired "discretion be used in deciding whether to employ 
group housing," id. Although it is true (as the district court 
noted and Jurnove here argues) that even in the final rule-
making the Secretary observed that "[i]n general, housing in 
groups promotes psychological well-being more assuredly 
than does individual housing," 943 F. Supp. at 60 (quoting 56 
Fed. Reg. at 6472-73), that generality was obviously qualified 
by the remarks just quoted.

 Thus the Secretary proposed a new regulation on social 
grouping:

 The environment enhancement plan must include specific 
 provisions to address the social needs of nonhuman pri-
 mates of species known to exist in social groups in 
 nature. Such specific provisions must be in accordance 
 with currently accepted professional standards, as cited 
 in appropriate professional journals or reference guides, 
 and as directed by the attending veterinarian.
 
55 Fed. Reg. at 33525; 9 CFR s 3.81(a) (final rule same). 
The regulation then offers "exceptions" to the social needs 
provision if the primate is vicious or debilitated, if it carries 
contagious diseases, or if its potential companions are not 
compatible. Id. s 3.81(a)(1)-(3). Even though social group-
ing is no longer formally mandated (facilities must only 
produce a "specific" plan for action that addresses "social 
needs"), the Secretary rightly argues that the enumeration of 
the "exceptions" makes social grouping the "norm."

 Contrary to the view of the district court, the statute did 
not force the Secretary to require social grouping and then 
specify exceptions. See 943 F. Supp. at 60. To the contrary, 
we accord agencies broad deference in choosing the level of 
generality at which to articulate rules. See American Truck-
ing Ass'ns v. Department of Transp., 166 F.3d 374, 380 (D.C. 
Cir. 1999); New Mexico v. EPA, 114 F.3d 290, 293 (D.C. Cir. 
1997). Nothing in the statutory mandate required greater 

specificity. See New Mexico, 114 F.3d at 293 (statutory 
mandate to set "criteria" for waste plant certification "says 
nothing to suggest that the criteria must be detailed or 
quantitative"); Public Citizen v. FAA, 988 F.2d 186, 191-92 
(D.C. Cir. 1993) (statutory mandate to set "minimum staffing 
levels" did not require specification of precise numbers of 
personnel). Much as in New Mexico, because the Secretary 
was reasonably concerned that more precise specification 
might cause harm, it was entirely reasonable under the 
statute for him to choose a relatively flexible standard. See 
55 Fed. Reg. at 33491; New Mexico, 114 F.3d at 293.2

 The explanation that renders the Secretary's interpretation 
of the statute reasonable also serves to establish that the final 
rule was not arbitrary and capricious. Compare Arent, 70 
F.3d at 616-17. Where "Congress delegates power to an 
agency to regulate on the borders of the unknown, courts 
cannot interfere with reasonable interpretations of equivocal 
evidence"; courts are most deferential of agency readings of 
scientific evidence. See New York v. EPA, 852 F.2d 574, 580 
(D.C. Cir. 1988) (quoting Public Citizen Health Research 
Group v. Tyson, 796 F.2d 1479, 1505 (D.C. Cir. 1986)). There 
is little question that the Secretary was forced to regulate "on 
the borders of the unknown" in setting the baseline of rights 
to "psychological well-being" for nonhuman primates, or at 
least how to "promote" their psychological well-being. In 
changing the design of the regulations, the Secretary pointed 
to substantial conflicting evidence on whether a stringent 
social grouping requirement was a good idea, 55 Fed. Reg. at 
33491, and thus his final policy judgment on social grouping 
was reasonable.

 Jurnove may well be correct that some of the Secretary's 
regulations may prove difficult to enforce, or even difficult to 
augment through subsequent "interpretation." Cf. Hoctor v. 

__________
 2 It is difficult to discern what difference use of the district 
court's preferred method (a requirement subject to exceptions) 
would make. Given the Secretary's amply supported findings, the 
exceptions would necessarily have been at a rather broad level of 
generality.

USDA, 82 F.3d 165 (7th Cir. 1996). But the requirements 
such as the ones on cage size and restraints are eminently 
enforceable, and the Secretary has begun to offer interpreta-
tions likely to assist both regulatees and enforcers. See 
Draft Policy on Environment Enhancement for Nonhuman 
Primates, 64 Fed. Reg. 38145 (1999).

 * * *

 Two final issues. ALDF now asserts standing in its own 
right on the basis of an "informational injury": the proposed 
rules required that facilities submit performance plans to the 
agency (potentially making them subject to the Freedom of 
Information Act), but the final rule required only that the 
plans "be made available to APHIS upon request." 9 CFR 
s 3.81. ALDF's alleged "informational injury" is the lack of 
sufficient notice of this rule change. The argument is fore-
closed, however, by ALDF's failure to raise the "information-
al injury" theory before the first panel to hear this appeal. 
See Animal Legal Defense Fund, Inc. v. Glickman, 130 F.3d 
464, 470 (D.C. Cir. 1997) ("ALDF specifically disclaims any 
informational injury resulting from a violation of the Animal 
Welfare Act."). This leaves only ALDF's procedural claim 
that the change was not a "logical outgrowth" of the earlier 
proposal and thus a violation of "notice and comment" re-
quirements. But standing to raise a procedural injury re-
quires that the procedural norm be one "designed to protect 
some threatened concrete interest" of the plaintiff, see Lujan 
v. Defenders of Wildlife, 504 U.S. 555, 573 n.8 (1992), and the 
prior panel found that ALDF had advanced no such concrete 
interest. 130 F.3d at 470-71.

 The second issue concerns intervention by the National 
Association for Biomedical Research, which argued for up-
holding the Secretary's regulations. Plaintiff (presumably 
Jurnove) challenges the Association's intervention on several 
grounds. Since we uphold the Secretary's regulations, the 
issues surrounding the intervention are at present moot. If 
the Association seeks participation in any future proceedings, 
the issue of intervention can be determined at that time, 

dependent upon its showing of the inadequacy of government 
representation of its interests then in prospect. See Solid 
Waste Agency v. United States Army Corps of Eng'rs, 101 
F.3d 503, 508-09 (7th Cir. 1996).

 * * *

 The decision of the district court is

 Reversed.