ANIMAL LEGAL DEFENSE FUND,
INC., et al., Appellees,

v.

Daniel R. GLICKMAN, In his official
capacity as Secretary, United States
Department of Agriculture, et al., Ap-
pellants.

National Association for Biomedical
Research, Appellee.

Nos. 97–5009, 97–5031 and 97–5074.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 29, 1999.

Decided Feb. 1, 2000.

John S. Koppel, Attorney, U.S. Department of Justice, argued the cause for appellants Glickman, et al. in 97–5031. With him on the briefs were David W. Ogden, Acting Assistant Attorney General, Michael Jay Singer, Attorney, and Wilma A. Lewis, U.S. Attorney.

Harris Weinstein argued the cause for appellant National Association for Biomedical Research in No. 97–5009. Michael G. Michaelson was with him on the brief.

Sheldon E. Steinbach, Robert H. Loeffler and Stephen S. Dunham were on the brief for amici curiae The Association of American Medical Colleges, The American Council on Education and The Pharmaceutical Research and Manufacturers Association of America.

Katherine A. Meyer and Valerie J. Stanley filed the briefs for appellants in No. 97–5074.

Katherine A. Meyer argued the cause for appellees in No. 97–5009. With her on the brief was Valerie J. Stanley.

Harris Weinstein and Michael G. Michaelson were on the brief for the National Association for Biomedical Research as appellee in No. 97–5074.

Leslie G. Landau was on the brief for amicus curiae The Jane Goodall Institute for Wildlife Research, Education and Conservation.

Before: WILLIAMS, SENTELLE, GARLAND, Circuit Judges.

Opinion for the court filed by Circuit Judge WILLIAMS.

WILLIAMS, Circuit Judge:

In *Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426 (D.C.Cir.1998) (en banc), we held that plaintiff Marc Jurnove has standing to challenge regulations promulgated by the Secretary of Agriculture in 1991 that purport to set "minimum requirements ... for a physical environment adequate to promote the psychological well-being of primates." 7 U.S.C. § 2143(a)(1)-(2). The en banc court left untouched the panel's decision that Animal Legal Defense Fund lacked standing. 154 F.3d at 428–29 n. 3. The court referred the merits—the question whether the Secretary's regulations satisfy that statutory mandate and the Administrative Procedure Act—to a future panel. *Id.* at 429, 445. Finding that the regulations do meet

the statutory and APA tests, we reverse the district court's decision to the contrary.

\* \* \*

In 1985 Congress passed the Improved Standards for Laboratory Animals Act, Pub.L. No. 99–198, 99 Stat. 1645, amending the Animal Welfare Act of 1966. See 7 U.S.C. § 2131 et seq. The 1985 amendments directed the Secretary of Agriculture to promulgate "standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors." *Id.* § 2143(a)(1). The Act specified that among these must be "minimum requirements ... for a physical environment adequate to promote the psychological well-being of primates." *Id.* § 2143(a)(1)-(2).

There are over 240 species of non-human primates, ranging from marmosets of South America that are a foot tall and weigh less than half a pound to gorillas of western Africa standing six feet tall and weighing up to 500 pounds. It proved no simple task to design regulations to promote the psychological well-being of such varied species as they are kept and handled for exhibition and research. Notice of intent to issue regulations was first published in the Federal Register in 1986, 51 Fed.Reg. 7950 (1986), but the Secretary did not publish proposed regulations until 1989. 54 Fed.Reg. 10897 (1989). After receiving a flood of comments (10,686 timely ones, to be precise), the Secretary reconsidered the regulations and published new proposed regulations in 1990. 55 Fed.Reg. 33448 (1990). After receiving another 11,-392 comments, he adopted final regulations in 1991. 56 Fed.Reg. 6426 (1991); 9 C.F.R. § 3.81.

The final regulations consist of two separate modes of regulation, typically known as engineering standards and performance standards. The former dictate the required means to achieve a result; the latter state the desired outcomes, leaving to the facility the choice of means. See 56 Fed.Reg. at 6427 (discussing engineering and performance standards generally). The Secretary identifies five guidelines that he considers engineering standards, which in substance require as follows: (1) restraints are generally prohibited subject to certain exceptions as determined by the attending veterinarian or the research proposal, 9 C.F.R. § 3.81(d); (2) primary enclosures must be "enriched" so that primates may exhibit their typical behavior, such as swinging or foraging, *id.* § 3.81(b); (3) certain types of primates must be given special attention, including infants, young juveniles, individually housed primates, and great apes over 110 pounds, again in accord with "the instructions of the attending veterinarian," *id.* § 3.81(c); (4) facilities must "address the social needs of non-human primates ... in accordance with currently accepted professional standards ... and as directed by the attending veterinarian," but they may individually house primates under conditions further specified in the regulations, *id.* § 3.81(a); and (5) minimum cage sizes are set according to the typical weight of different species, *id.* § 3.80(b)(2)(i).

To implement these guidelines and to promote the psychological well-being of the primates, facilities must develop performance plans:

> Dealers, exhibitors, and research facilities must develop, document, and follow an appropriate plan for environment enhancement adequate to promote the psychological well-being of nonhuman primates. The plan must be in accordance with the currently accepted professional standards as cited in appropriate professional journals or reference guides, and as directed by the attending veterinarian. This plan must be made available to APHIS [Animal and Plant Health Inspection Service] upon request, and, in the case of research facilities, to officials of any pertinent funding agency.

*Id.* § 3.81.

Jurnove primarily maintains that nothing about these regulations establishes

"minimum requirements ... for a physical environment adequate to promote the psychological well-being of primates," and that the Secretary's use of performance plans and his apparent deference to on-site veterinarians amount to an impermissible delegation of his legal responsibility.

The district court agreed. *Animal Legal Defense Fund v. Glickman ("ALDF")*, 943 F.Supp. 44 (D.D.C.1996). It held that the regulation "fails to set standards," by which the district court meant engineering standards, and that "the regulation completely delegates the establishment of such standards to the regulated entities" because "[a]t best, the regulation refers these entities to the direction of their attending veterinarians—who are not under the control of the agency." *Id.* at 59. The district court also concluded that the Secretary had a duty to require social housing of primates given a finding by the Secretary that "[i]n general, housing in groups promotes psychological well-being more assuredly than does individual housing." *Id.* at 60 (quoting 56 Fed.Reg. at 6473). As the court read the regulation "the agency delineates only when social grouping might not be provided," and therefore "the regulation does not contain any minimum requirement on a point recognized by the agency itself as critical to the psychological well-being of primates." *Id.*

* * *

Jurnove argues that the plain language of the statute—the Secretary shall establish "minimum requirements ... for a physical environment adequate to promote the psychological well-being of primates"— requires that the Secretary spell out exactly how primates may and may not be housed and handled (i.e., engineering standards), or at least spell out the "minimum requirements" in this manner. The Secretary's emphatic first response is: we did.

Jurnove consistently reads the regulations, as did the district court, as if the only "requirement" of the facilities is the production of a performance plan and that,

basically, anything goes—provided the facilities honor what he views as the empty formality of finding some sort of support from "currently accepted professional standards as cited in appropriate professional journals or reference guides" and from "the attending veterinarian." 9 CFR § 3.81. This reading yields an obvious parade of horribles. Facilities will find unscrupulous veterinarians to rubberstamp outrageous practices, and fringe periodicals will be the coin of the animal realm. This, argues Jurnove, is not the setting of "standards" or "minimum requirements" that the statute plainly commands.

■ We need not decide when performance standards alone could satisfy a congressional mandate for minimum requirements, or whether the sort of agency deference depicted by Jurnove could ever do so. The regulations here include specific engineering standards. The most obvious example is the regulation of cage sizes, *id.* § 3.80, which even Jurnove grants is an engineering standard. Jurnove attempts to discount the "primary enclosure" requirements because they appear in a different section of the regulations, and the Animal Welfare Act had previously mandated standards for "housing." But the Secretary stated that the cage requirements were set as part of the standards for promoting psychological well-being, 56 Fed.Reg. at 6468, and it is perfectly permissible to implement congressional commands through complementary regulations, some of which serve multiple goals. See *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 192–93 (D.C.Cir. 1993).

The Secretary's requirement bases cage size on the weight of the primate, with special provisions for great apes, whereas the previous regulations merely required "sufficient space to allow each nonhuman primate to make normal postural adjustments with adequate freedom of movement." 56 Fed.Reg. at 6469. By hiking

the requirements, the Secretary addressed an issue that Congress considered one of the central elements of a primate's psychological well-being. The statutory language speaks of minimum requirements for the "physical environment" of the primate, 7 U.S.C. § 2143(a)(2)(B), and the Conference Committee noted that "[t]he intent of standards with regard to promoting the psychological well-being of primates is *to provide adequate space* equipped with devices for exercise consistent with the primate's natural instincts and habits." H.R. Conf. Rep. No. 99–447, at 594 (1985) (emphasis added).

Similarly, the regulations on environmental enrichment, special consideration of certain primates (infants, juveniles, etc.), and restraint devices all plainly provide engineering standards. 9 C.F.R. § 3.81(b)-(d). The facilities "must" provide environmental enrichment and special consideration for certain primates, *id.* § 3.81(b), (c), and they "must not" maintain primates in restraint devices "unless required for health reasons as determined by the attending veterinarian or by a research proposal approved by the Committee at research facilities," *id.* § 3.81(d). The regulation on restraints then makes clear that even where a veterinarian approves of restraints, there are still limits:

> Maintenance under such restraint must be for the shortest period possible. In instances where long-term (more than 12 hours) restraint is required, the nonhuman primate must be provided the opportunity daily for unrestrained activity for at least one continuous hour during the period of restraint, unless continuous restraint is required by the research proposal approved by the Committee at research facilities.

*Id.* Although research facilities may be allowed to restrain primates continuously, this limited exception is not offered to non-

research handlers and is in keeping with the statute's bar on the Secretary from interfering with research. See 7 U.S.C. § 2143(a)(6)(A)(i)-(iii).

These "requirements" may be minimal but they are clearly mandatory. Jurnove argued, and the district court agreed, that this case begins and ends with the fact that the Secretary provided *no* engineering standards. *ALDF,* 943 F.Supp. at 59. But in fact he did.[1]

■ It of course remains possible that the engineering and performance standards chosen by the Secretary are not enough to meet the mandate of "minimum requirements." We assess this issue under the familiar doctrine that if Congress has spoken to the precise question at issue, we must "give effect to the unambiguously expressed intent of Congress," but if Congress has not, we defer to a permissible agency construction of the statute. *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Here Jurnove's Exhibit A (and indeed his only serious example) is the Secretary's handling of primates' "social grouping." In 1989 the Secretary proposed to include a requirement of group housing for primates, saying that he intended to emphasize that

> nonhuman primates must be grouped in a primary enclosure with compatible members of their species or with other nonhuman primate species, either in pairs, family groups, or other compatible social groupings, whenever possible and consistent with providing for the nonhuman primates' health, safety, and well-being, unless social grouping is prohibited by an animal care and use procedure and approved by the facility's Committee.

1. Having found that the Secretary "ha[s] not yet issued standards," the district court went on to hold that he had "unlawfully withheld and unreasonably delayed" action in violation of the APA; it ordered the Secretary to "com-

mence appropriate rulemaking procedures" and promulgate standards. 943 F.Supp. at 59–60. Our holding here moots this theory and accordingly we vacate that portion of the order.

**234**

54 Fed.Reg. 10822, 10917 (1989). This proposal was based on evidence that "non-human primates are social beings in nature and require contact with other nonhuman primates for their psychological well-being," and that "[s]ocial deprivation is regarded by the scientific community as psychologically debilitating to social animals." *Id.*

The final rule, of course, refrained from imposing such a general group housing requirement. Jurnove (stating his case in the best light) would tie the agency to its 1989 proposal on two theories: He argues first under *Chevron* that because of this finding any interpretation of the statute not recognizing social grouping as one of the "minimum requirements" could not be a reasonable interpretation of the statute. And second he claims that the Secretary's decision was arbitrary and capricious because he failed to explain it adequately, in violation of the Administrative Procedure Act and the principles set out in *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). We have distinguished between *Chevron* review and *State Farm* arbitrary and capricious review, see *Arent v. Shalala*, 70 F.3d 610, 615–16 (D.C.Cir.1995), but the two issues "overlap at the margins," *id.* at 615, 616 n. 6; *Independent Petroleum Assn. v. Babbitt*, 92 F.3d 1248, 1258 (D.C.Cir.1996), and our review here exemplifies such overlap. See also Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise*, § 7.4, p. 214–15 (Supp.1998) ("[T]here is complete overlap between *Chevron* step two and *State Farm* . . . a rule that adopts an 'unreasonable' interpretation of a statute within the meaning of *Chevron* step two is 'arbitrary and capricious' within the meaning of *State Farm*.").

The Secretary's 1989 proposal was at odds with comments already in the record. For example, comments of the American Psychological Association had noted the wide disparities in social behavior among primates, with some forming large troops of 50 to 100 or more, others living in small groups of 10 to 20, and still others spending their lives in almost solitary isolation or as pairs in the wild. The 1989 proposal itself then generated new opposing comments, most notably from the University of Chicago, which pointed out that group housing "can significantly increase the incidence of trauma, the spread of upper respiratory and gastrointestinal diseases and more recently has been responsible for the outbreak of Simian Acquired Immune Deficiency Syndrome." Moreover, according to these comments, an image of nonhuman primates blissfully coexisting in groups is a substantially incomplete depiction of species-typical behavior. Again, as the University of Chicago informed the Secretary: "Even in compatible groups in no specific distress, species typical activities include threatening, chasing, fighting, wounding, hair-pulling, food competition, dominance challenges and reversals, and displacement of subordinate animals from food, water and shelter. Such activity can threaten the animals' health and well-being."

The Secretary took account of such comments, just as the designers of "notice and comment" rulemaking intended. He pointed to expressions of concern that "social grouping would endanger the animal's [sic] welfare by increasing noise and fighting," 55 Fed.Reg. at 33491, and to contentions that differences among species (there are, recall, over 240) required "discretion be used in deciding whether to employ group housing," *id.* Although it is true (as the district court noted and Jurnove here argues) that even in the final rulemaking the Secretary observed that "[i]n general, housing in groups promotes psychological well-being more assuredly than does individual housing," 943 F.Supp. at 60 (quoting 56 Fed.Reg. at 6472–73), that generality was obviously qualified by the remarks just quoted.

Thus the Secretary proposed a new regulation on social grouping:

> The environment enhancement plan must include specific provisions to ad-

dress the social needs of nonhuman primates of species known to exist in social groups in nature. Such specific provisions must be in accordance with currently accepted professional standards, as cited in appropriate professional journals or reference guides, and as directed by the attending veterinarian.

55 Fed.Reg. at 33525; 9 C.F.R. § 3.81(a) (final rule same). The regulation then offers "exceptions" to the social needs provision if the primate is vicious or debilitated, if it carries contagious diseases, or if its potential companions are not compatible. *Id.* § 3.81(a)(1)-(3). Even though social grouping is no longer formally mandated (facilities must only produce a "specific" plan for action that addresses "social needs"), the Secretary rightly argues that the enumeration of the "exceptions" makes social grouping the "norm."

[redacted] Contrary to the view of the district court, the statute did not force the Secretary to require social grouping and then specify exceptions. See 943 F.Supp. at 60. To the contrary, we accord agencies broad deference in choosing the level of generality at which to articulate rules. See *American Trucking Ass'ns v. Department of Transp.*, 166 F.3d 374, 380 (D.C.Cir.1999); *New Mexico v. EPA,* 114 F.3d 290, 293 (D.C.Cir.1997). Nothing in the statutory mandate required greater specificity. See *New Mexico,* 114 F.3d at 293 (statutory mandate to set "criteria" for waste plant certification "says nothing to suggest that the criteria must be detailed or quantitative"); *Public Citizen v. FAA,* 988 F.2d 186, 191–92 (D.C.Cir.1993) (statutory mandate to set "minimum staffing levels" did not require specification of precise numbers of personnel). Much as in *New Mexico,* because the Secretary was reasonably concerned that more precise specification might cause harm, it was entirely reasonable under the statute for him to choose a relatively flexible standard. See 55 Fed. Reg. at 33491; *New Mexico,* 114 F.3d at 293.[2]

[redacted] The explanation that renders the Secretary's interpretation of the statute reasonable also serves to establish that the final rule was not arbitrary and capricious. Compare *Arent,* 70 F.3d at 616–17. Where "Congress delegates power to an agency to regulate on the borders of the unknown, courts cannot interfere with reasonable interpretations of equivocal evidence"; courts are most deferential of agency readings of scientific evidence. See *New York v. U.S. E.P.A.*, 852 F.2d 574, 580 (D.C.Cir.1988) (quoting *Public Citizen Health Research Group v. Tyson,* 796 F.2d 1479, 1505 (D.C.Cir.1986)). There is little question that the Secretary was forced to regulate "on the borders of the unknown" in setting the baseline of rights to "psychological well-being" for nonhuman primates, or at least how to "promote" their psychological well-being. In changing the design of the regulations, the Secretary pointed to substantial conflicting evidence on whether a stringent social grouping requirement was a good idea, 55 Fed.Reg. at 33491, and thus his final policy judgment on social grouping was reasonable.

Jurnove may well be correct that some of the Secretary's regulations may prove difficult to enforce, or even difficult to augment through subsequent "interpretation." Cf. *Hoctor v. USDA,* 82 F.3d 165 (7th Cir.1996). But the requirements such as the ones on cage size and restraints are eminently enforceable, and the Secretary has begun to offer interpretations likely to assist both regulatees and enforcers. See *Draft Policy on Environment Enhancement for Nonhuman Primates,* 64 Fed. Reg. 38145 (1999).

2. It is difficult to discern what difference use of the district court's preferred method (a requirement subject to exceptions) would make. Given the Secretary's amply supported findings, the exceptions would necessarily have been at a rather broad level of generality.

* * *

Two final issues. ALDF now asserts standing in its own right on the basis of an "informational injury": the proposed rules required that facilities submit performance plans to the agency (potentially making them subject to the Freedom of Information Act), but the final rule required only that the plans "be made available to APHIS upon request." 9 C.F.R. § 3.81. ALDF's alleged "informational injury" is the lack of sufficient notice of this rule change. The argument is foreclosed, however, by ALDF's failure to raise the "informational injury" theory before the first panel to hear this appeal. See *Animal Legal Defense Fund, Inc. v. Glickman*, 130 F.3d 464, 470 (D.C.Cir.1997) ("ALDF specifically disclaims any informational injury resulting from a violation of the Animal Welfare Act."). This leaves only ALDF's procedural claim that the change was not a "logical outgrowth" of the earlier proposal and thus a violation of "notice and comment" requirements. But standing to raise a procedural injury requires that the procedural norm be one "designed to protect some threatened concrete interest" of the plaintiff, see *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n. 8, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), and the prior panel found that ALDF had advanced no such concrete interest. 130 F.3d at 470–71.

The second issue concerns intervention by the National Association for Biomedical Research, which argued for upholding the Secretary's regulations. Plaintiff (presumably Jurnove) challenges the Association's intervention on several grounds. Since we uphold the Secretary's regulations, the issues surrounding the intervention are at present moot. If the Association seeks participation in any future proceedings, the issue of intervention can be determined at that time, dependent upon its showing of the inadequacy of government representation of its interests then in prospect. See *Solid Waste Agency v. United States Army Corps of Eng'rs*, 101 F.3d 503, 508–09 (7th Cir.1996).

* * *

The decision of the district court is

*Reversed.*